## AFFIDAVIT OF SPECIAL AGENT TYLER J. SACKETT

I, Tyler J. Sackett, Special Agent with the Federal Bureau of Investigations ("FBI"), being duly sworn, depose and state as follows:

## INTRODUCTION

1.  I am a Special Agent employed by the FBI. I have been a Special Agent with the FBI since September 2018.  I am currently assigned to the Boston Field Office, Lowell Resident Agency.  I am assigned to work criminal matters to include investigations focused on transnational organized crime, threats to life, violent gangs, drug trafficking, and violent crimes against children. Prior to my current assignment I attended the FBI Academy in Quantico, Virginia for approximately six months where I received extensive training in the area of federal criminal and constitutional law, investigative methods, and evidence collection.  I am a graduate of the United States Naval Academy where I received my bachelors of science in Political Science, American Politics and Law. Prior to my current employment, I was an Infantry Officer in the United States Marine Corps.

2.  As an FBI Special Agent, I am authorized to investigate violations of the laws of the United States, including violations of federal narcotics laws in Title 21 of the United States Code.  During my law enforcement career, I have received specialized training regarding the activities of narcotics traffickers, including the methods used to package, store, and distribute narcotics, and the methods used by narcotics traffickers to conceal and launder the proceeds of their narcotics trafficking activities.

3.  I am familiar with the manner and means commonly employed by drug traffickers, including those employed to avoid detection by law enforcement.  I am also familiar with the terminology and slang commonly employed by drug traffickers.  In my training and experience, I

have observed and examined cocaine, cocaine base ("crack"), heroin, fentanyl, oxycodone, and other controlled substances.  I am aware of the prices commonly charged on the street for these substances, the method of packaging, and the street terms used in their trade.

4.      I have participated in various aspects of drug-related investigations.  I have participated in controlled purchases of controlled substances utilizing confidential sources and undercover law enforcement agents and officers.  I have prepared affidavits for federal court– in support of applications for criminal complaints, search warrants, and tracking warrants.  I have also conducted and coordinated electronic and physical surveillance of individuals involved in the illegal distribution of controlled substances.

5.      Based on my training and experience, I am familiar with the methods of operation employed by drug traffickers operating at the local, statewide, national and international levels, including those involving the distribution, storage, and transportation of controlled substances and the collection of money that constitutes the proceeds of drug-trafficking activities.  Specifically, I am familiar with the manner in which drug traffickers use vehicles, common carriers, mail and private delivery services, and a variety of other means to transport and distribute narcotics and the proceeds of narcotics trafficking.  I am familiar with the manner in which drug traffickers often store drugs and drug proceeds in storage sites commonly referred to as "stash houses."  I also am familiar with the manner in which drug traffickers use telephones, coded or slang-filled conversations, text messages, pager messages, and other means to facilitate their illegal activities and prevent detention.

## PURPOSE OF AFFIDAVIT

6.      I am submitting this affidavit in support of:

    a.      An application for the issuance of a search warrant authorizing the search of 36 Oakland Avenue, Apartment 16, Methuen, Massachusetts 01844

("Target Location #1"). A complete description of the property to be searched is set forth in Attachment A, which is attached hereto and incorporated herein.

b.     An application for the issuance of a search warrant authorizing the search of 367 Hildreth Street, Apartment 22, Lowell, Massachusetts 01850 ("Target Location #2"). A complete description of the property to be searched is set forth in Attachment B, which is attached hereto and incorporated herein.

c.     A criminal complaint charging Steven PEREZ, a/k/a "Stick," and Anthony HOLLOWAY, a/k/a "Tony," with conspiracy to distribute and possess with intent to distribute fentanyl, in violation of 21 U.S.C. §§ 846 and 841(a)(1).

7.     As explained more fully below, between September 5, 2019 and October 10, 2019, a FBI confidential informant ("CI") purchased suspected crack cocaine and fentanyl from or at the direction of PEREZ and HOLLOWAY. I believe PEREZ is using Target Location #1 to facilitate his drug trafficking and I believe PEREZ resides at Target Location #2 as well as using it to facilitate his drug trafficking with HOLLOWAY. I have previously sought and obtained search warrants for the precise location information for the telephone utilized by PEREZ. *See* 19-mj-6568-MPK and 19-mj-6501-MPK.

8.     As a result, I submit that there is probable cause to believe that the Target Locations to be searched contain records and other evidence of the following offenses: (a) possession with intent to distribute and/or distribution of controlled substances, in violation of 21 U.S.C. § 841(a)(1); (b) use of a communications facility in the commission of controlled substances trafficking offenses, in violation of 21 U.S.C. § 843(b); and (c) conspiracy to possess with intent to distribute and to distribute controlled substances, in violation of 21 U.S.C. § 846 (collectively, the "Target Offenses"). More specifically, as will be discussed below, I submit that there is probable cause to believe that evidence of the Target Offenses, as set forth in Attachment C will be located at the Target Locations to be searched, as described in Attachments A and B. I further

believe there is probable cause to believe that PEREZ and HOLLOWAY have conspired to distribute fentanyl, in violation of 21 U.S.C. § 846 and 841(a)(1).

9.     I have personally participated in this investigation since September 2019.  I am familiar with the facts and circumstances of this investigation based upon: (a) my personal knowledge and involvement in this investigation; (b) my review of records related to this investigation; (c) information provided to me orally and in writing by other law enforcement agents; and (d) my experience and training as a criminal investigator.

10.     Because this affidavit is submitted for the limited purpose of establishing probable cause that evidence of criminal activity involving the Target Offenses is located at the Target Locations and that PEREZ and HOLLOWAY conspired to distribute and possess with intent to distribute controlled substances, I have not included each and every fact known to me or other law enforcement officers involved in this investigation.  Rather, I have included only those facts that I believe are sufficient to establish probable cause for the issuance of the requested search warrants and criminal complaint.  All times herein are approximate.

## BACKGROUND OF THE INVESTIGATION

11.     Since August 2019, the FBI, Lowell Resident Agency ("RA") and Methuen Police Department have been investigating PEREZ and his distribution of controlled substances in the Methuen, Lawrence, Dracut and Lowell areas of Massachusetts, known as the Merrimack Valley Region of Massachusetts.  **On August 14, 2019**, an FBI CI[1] provided information that a person

---

1 The CI has a history of assault and battery, receiving stolen property, and drug arrests and convictions. The CI has no current or pending charges. The CI was cooperating with law enforcement for monetary compensation. Around October 17, 2019, the FBI terminated its relationship with the CI after agents observed the CI's vehicle in the area of 36 Oakland Avenue on October 16, 2019 without express permission or at the direction of investigators. When confronted, the CI reported that the CI had purchased one prescription pill from an individual known only by his street name.  No further illegal activity was observed. Agents have corroborated information received from the CI as detailed below, all controlled purchases were audio and video recorded, and I believe that the information received from the CI is reliable.

known as "Stick" was dealing drugs in Methuen. Based on the information provided by the CI, officers' surveillance described below, consensual audio and video recordings made by the CI, law enforcement databases, and prior law enforcement encounters, investigators identified "Stick" as PEREZ.

12.      **Between September 5, 2019, and October 10, 2019**, the FBI CI conducted six controlled purchases of narcotics from PEREZ and HOLLOWAY.   Prior to each controlled purchase, the CI called PEREZ and ordered varying quantities of heroin and/or fentanyl. Not all of the phone calls setting up the controlled purchases were recorded or monitored. All of the personal meetings during the controlled purchases were audio and/or video recorded and monitored by investigators.   After each of the phone calls setting up the controlled purchases, PEREZ and/or HOLLOWAY met with the CI to deliver the drugs that had been ordered.   Prior to and immediately following each controlled purchase, investigators searched the CI and the CI's vehicle for contraband with negative results.   Investigators also conducted contemporaneous physical surveillance of the meetings to the extent possible.

## **PROBABLE CAUSE**

September 5, 2019: Controlled purchase of suspected fentanyl from PEREZ inside

Target Location #1

13.      **On September 5, 2019**, under the supervision and direction of the FBI, the CI conducted a controlled purchase of $50 worth of crack cocaine and $50 worth of suspected heroin/fentanyl from PEREZ. Prior to meeting with agents, the CI placed an order for $50 worth of crack cocaine and $50 worth of heroin/fentanyl with PEREZ.  Agents then provided the CI with $100 in official agency funds. In the presence of agents, the CI called PEREZ, who told the CI to

meet behind the Sunoco Gas Station on Broadway in Lawrence.   **At 5:57 p.m.**, investigators followed the CI to the area of the Sunoco Gas Station on Broadway in Lawrence.

14.     **At 6:05 p.m.**, surveillance officers observed an adult male wearing a black shirt and black pants approach the passenger side door of the CI's vehicle and open the door. The CI knew this individual only as "Jay." Inside the vehicle, the CI exchanged $50 for three bags of suspected crack cocaine. Jay told the CI that he did not have the "brown," a common street term for heroin/fentanyl, but that "Stick" had the "brown." Shortly thereafter, Jay departed the CI's vehicle. **At 6:06 p.m.**, the CI departed the Sunoco Gas Station and drove to the predetermined meeting location followed by surveillance officers. There, the CI provided agents three small plastic bags containing crack cocaine.

15.     The CI then called PEREZ to ask PEREZ about the "brown." PEREZ told the CI to go to **Target Location #1** to get it. **At 6:32 p.m.**, the CI drove to the area of Target Location #1. **At 6:38 p.m.**, the CI entered **Target Location #1**. Inside, the CI exchanged $50 for a bag of suspected fentanyl from PEREZ. **At 6:45 p.m.**, the CI exited **Target Location #1** and proceeded directly to the predetermined meeting location where the CI provided agents one small plastic bag containing a brown substance. The DEA Laboratory has tested the crack and confirmed it contains cocaine base; the suspected fentanyl is pending lab analysis but was field tested using a TRUNARC system and tested positive for fentanyl compound or methamphetamine.

*September 11, 2019: Controlled purchase of suspected fentanyl from PEREZ and HOLLOWAY in the vicinity of Target Location #2*

16.     **On September 11, 2019**, the CI conducted a controlled purchase of one "finger" (meaning 10 grams) of heroin/fentanyl from HOLLOWAY, at the direction of PEREZ. Before meeting agents, the CI called PEREZ and was directed to call back in one hour to set up a meeting

location. Agents then provided the CI with $250 in official agency funds. In the presence of agents, the CI called PEREZ and PEREZ directed the CI to meet at 301 Pleasant Street, Dracut, Massachusetts, a Hannaford Supermarket which is a five to ten minute walk to **Target Location #2**. **At 5:54 p.m.**, the CI drove to the Hannaford Supermarket.

17.     **At 6:23 p.m.**, the CI called PEREZ and PEREZ advised the CI that someone named Tony would meet the CI, and provided a description of Tony. Upon reviewing video of the controlled purchase, investigators identified Tony as Anthony HOLLOWAY through prior law enforcement encounters and photographs of HOLLOWAY from law enforcement databases. PEREZ described what HOLLOWAY was wearing to the CI and stayed on the phone with the CI until HOLLOWAY arrived to the CI's vehicle. **At 6:24 p.m.**, surveillance officers observed HOLLOWAY approach the passenger side door of the CI's vehicle, open the door, and enter the CI's vehicle. The CI paid HOLLOWAY $250 and HOLLOWAY provided the CI a cylinder of brown powdery substance. The CI then drove to the back of the Hannaford Supermarket where HOLLOWAY exited the vehicle. Shortly thereafter, surveillance officers observed HOLLOWAY walking on Hildreth Street in Lowell away from Hannaford in the direction of **Target Location #2**. **At 6:25 p.m.**, the CI departed and drove to the predetermined meeting location, where the CI provided agents with the suspected drugs. Agents then field tested using a TRUNARC system and the brown substance tested positive for fentanyl compound or methamphetamine; lab analysis is pending.

<u>September 18, 2019: Controlled purchase of suspected fentanyl from PEREZ and HOLLOWAY</u>

<u>and surveillance of **Target Location #2**</u>

18.     **On September 18, 2019**, the CI conducted a controlled purchase of one "finger" (meaning 10 grams) of heroin/fentanyl from HOLLOWAY at the direction of PEREZ. Prior to

meeting agents, the CI called PEREZ who said to call again to coordinate a meeting location. Agents provided the CI with $250 in official agency funds. In the presence of agents, the CI sent a text message to PEREZ and was provided with the location 301 Pleasant Street in Dracut, the Hannaford Supermarket. **At 6:09 p.m.**, the CI drove to the Hannaford Supermarket. **At 6:19 p.m.**, the CI sent a text message to PEREZ stating that the CI was five minutes away. **At 6:20 p.m.**, the CI called PEREZ and confirmed the meeting location. At 6:22 p.m., surveillance officers observed HOLLOWAY exit the building of **Target Location #2**.

19. **At 6:22 p.m.**, the CI arrived at the Hannaford Supermarket. **At 6:25 p.m.**, surveillance officers observed HOLLOWAY walk across the Hannaford parking lot. **At 6:27 p.m.**, HOLLOWAY entered the CI's vehicle. The CI paid HOLLOWAY $250 and received a cylinder of brown powdery substance. HOLLOWAY requested that the CI provide HOLLOWAY with a "bump," meaning a small dose of the heroin/fentanyl he just provided. The CI provided a small dose of the heroin/fentanyl to HOLLOWAY. (When the CI later met with agents, agents admonished the CI for this conduct and instructed the CI that it was not permissible.). The CI then drove HOLLOWAY to a liquor store across from the Hannaford Supermarket where HOLLOWAY exited the vehicle. Shortly thereafter, surveillance officers observed HOLLOWAY exit the liquor store and walk on Hildreth Street towards the area of **Target Location #2**. **At 6:30 p.m.**, the CI drove to the predetermined meeting location, where the CI provided agents with the suspected drugs.  The drugs were field tested using a TRUNARC system and the brown substance tested positive for fentanyl compound or methamphetamine; lab analysis is pending

September 25, 2019: Controlled purchase of suspected fentanyl from PEREZ and surveillance of

**Target Location #1**

20.     **On September 25, 2019**, the CI conducted a controlled purchase of one "finger" (10 grams) of heroin/fentanyl from PEREZ.  **At 5:58 p.m.**, the CI called PEREZ and was directed to go to Target Location #1 for the previously arranged fentanyl deal. Agents then provided the CI with $250 and at 6:18 p.m., the CI drove to the area of **Target Location #1**. **At 6:22 p.m.**, surveillance officers observed the CI arrive and enter the building of **Target Location #1**. Inside, the CI paid PEREZ $250 and PEREZ gave the CI one clear plastic bag containing a brown substance.

21.     **At 6:26 p.m.**, surveillance officers observed the CI exit the building of **Target Location #1**, return to the CI's vehicle, and drive to the predetermined meeting location, where the CI provided agents one small clear plastic bag containing a brown substance. The drugs field tested positive for fentanyl compound or methamphetamine; lab analysis is pending.

22.     Investigators maintained surveillance of the building of **Target Location #1**, and at **6:29 p.m.**, they observed PEREZ exit with a black bag and enter a grey Acura sedan (bearing New Hampshire registration 4587453, a vehicle investigators knew to be used by PEREZ) and depart. **At 6:37 p.m.**, PEREZ arrived at O&M Towing at 354 Water Street in Lawrence. Two individuals approached the vehicle and subsequently PEREZ departed O&M Towing. Shortly thereafter, surveillance was discontinued due to PEREZ utilizing what appeared to be counter-surveillance and law enforcement detection techniques such as taking illogical routes, making frequent stops, and circling the block.

<u>October 3, 2019: Controlled purchase of suspected fentanyl from PEREZ and surveillance of **Target Location #1**</u>

23.     **On October 3, 2019**, the CI conducted a controlled purchase of one "finger" (10 grams) of heroin/fentanyl from PEREZ.  Before meeting agents, the CI called PEREZ and PEREZ

told the CI he was at a barbershop and told the CI to call back later when PEREZ would be at **Target Location #1** for the transaction. Agents provided the CI with $250 in official agency funds. **At 5:33 p.m.**, the CI attempted to contact PEREZ. However, PEREZ did not pick up the phone. **At 5:57 p.m.**, the CI called an associate of PEREZ, known only as Jay, to tell Jay to have PEREZ call the CI. Jay told the CI that PEREZ was around, meaning in the area of **Target Location #1**. **At 6:28 p.m.**, the CI drove to the area of Target Location #1. **At 6:35 p.m.**, the CI entered Target Location #1 and observed three other males (including Francis Covey), one of whom asked the CI to go to a different room so that they could mix the drugs. Shortly thereafter, the CI saw PEREZ arrive with two unidentified Hispanic males. PEREZ and the CI then went into the bathroom where the CI provided PEREZ with the $250 and PEREZ gave the CI one plastic bag containing a brown powdery substance. Prior to the CI departing, HOLLOWAY arrived at **Target Location #1.**

24.     **At 7:08 p.m.**, the CI departed, drove to a pre-determined location, and provided agents the suspected drugs, which were field tested and the results were inconclusive; lab results are pending.

October 10, 2019: Controlled purchase of suspected fentanyl from PEREZ and surveillance of **Target Location #1**

25.     **On October 10, 2019**, the CI conducted a controlled purchase of one "finger" (10 grams) of heroin/fentanyl from PEREZ.  **At 7:22 p.m.**, the CI placed an unrecorded call to PEREZ and ordered $250 worth of fentanyl. PEREZ told the CI to wait and PEREZ would call the CI when he was there. **At 7:43 p.m.**, PEREZ called and advised the CI to go to **Target Location #1**. Investigators provided the CI with $250 the CI drove to the area of **Target Location #1**. **At 7:50 p.m.**, the CI went into **Target Location #1** where the CI provided PEREZ $250 and PEREZ gave the CI one clear plastic bag containing a brown powdery substance.

26.     **At 7:53 p.m.,** the CI departed and drove to the predetermined meeting location and provided agents one plastic bag containing a brown powdery substance. The drugs field tested positive for fentanyl compound or methamphetamine; lab analysis is pending.

Identification of Target Location #1

27.     Target Location #1 is an elderly apartment complex run by the Methuen Housing Authority. Francis Covey is the current resident of this apartment. Covey has allowed PEREZ to deal narcotics out of this residence. **On September 25, 2019** investigators met with authorities from the Methuen Housing Authority and received consent to install a pole camera on their property to observe Target Location #1. The CI conducted four controlled drug purchases at Target Location #1. **On October 21, 2019,** investigators sought and obtained a search warrant to obtain the precise location information of PEREZ's telephone. This was the same telephone that the CI used to communicate with PEREZ and coordinate the controlled purchases. During the 30 days authorized by the search warrant, PEREZ's telephone was frequently in the area of Target Location #1. **On November 20, 2019**, agents sought and obtained a second search warrant for an additional 30 days of precise location information for PEREZ's telephone. Since the issuance of that warrant, the telephone was frequently located at Target Location #1. PEREZ has been observed at Target Location #1 during the same time periods that the precise location information for PEREZ's phone identified the phone at Target Location #1. In conjunction with the precise phone location data, the pole camera and physical surveillance has consistently revealed PEREZ and HOLLOWAY at Target Location #1. During multiple occasions while PEREZ and HOLLOWAY were at Target Location #1, and investigators observed (physically or via the pole camera) HOLLOWAY making frequent trips out of the building of Target Location #1 only to return a few minutes later. They also observed HOLLOWAY coming and going when

11

PEREZ was not at Target Location #1. Also, investigators observed numerous people who are not residents of the apartment complex frequently coming and going from the building of Target Location #1 while PEREZ and/or HOLLOWAY were present. Based upon my training and experience, this pattern of behavior is consistent with drug distribution occurring at Target Location #1. Based upon the information above and above-mentioned observations of HOLLOWAY and PEREZ at Target Location #1, and the Acura sedan known to be used by PEREZ and HOLLOWAY seen at Target Location #1, I believe that PEREZ and HOLLOWAY continue to use Target Location #1 as a place to commit the Target Offenses.

### Identification of PEREZ's residence (Target Location #2)

28.     Two of the controlled purchases occurred in the vicinity of Target Location #2. During the first purchase in the vicinity of Target Location #2, PEREZ was on the telephone with the FBI CI and described HOLLOWAY and his clothing to the CI. Immediately following the controlled purchase, investigators observed HOLLOWAY walking from the buy location on Hildreth Street towards Target Location #2. On the second controlled purchase in the vicinity of Target Location #2, investigators observed HOLLOWAY exit the building of Target Location #2 directly before the controlled purchase and return to the direction of Target Location #2 following the controlled purchase. **On October 21, 2019,** investigators sought and obtained a search warrant to obtain the precise location information of PEREZ's telephone. This was the same telephone that the CI used to communicate with PEREZ and coordinate the controlled purchases. During the 30 days authorized by the search warrant, PEREZ's telephone was consistently in the area of Target Location #2 during the evening and overnight hours. **On November 20, 2019**, agents sought and obtained a second search warrant for an additional 30 days of precise location information for PEREZ's telephone. Since the issuance of that warrant, the telephone has again consistently been

at Target Location #2 during the evening and overnight hours.  According to a law enforcement database and Registry of Motor Vehicle records, PEREZ had a listed address of 22 Maple Street, Lawrence, Massachusetts from 2008 until January 2019. Also according to law enforcement databases and Registry of Motor Vehicle records, PEREZ's brother Anthony Perez ("A. Perez") also had the previous address of 22 Maple Street, Lawrence, Massachusetts from 2008 until December 2019. Both PEREZ and A. Perez still have 22 Maple Street as their listed address with the RMV, and I believe that is not their most current address. Multiple law enforcement databases list Target Location #2 as a current address for A. Perez since March 2019.  Based upon the information above, the observations of HOLLOWAY leaving the building of Target Location #2, the Acura sedan known to be used by PEREZ and HOLLOWAY seen at Target Location #2, PEREZ's prior shared residence with A. Perez, I believe that PEREZ now resides at Target Location #2 and that PEREZ and HOLLOWAY use Target Location #2 as a place to facilitate the Target Offenses.

## Drug Traffickers' Use of Residences and Cell Phones Generally

29.    Based upon my experience and the experience of other law enforcement officers who have participated in the execution of numerous search warrants at the residences of drug-traffickers, I am aware that the following kinds of drug-related evidence have typically been recovered during searches of drug-traffickers' residences and locations of operation:

    a.  Controlled substances.

    b.  Paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, including but not limited to, plastic bags, heat-sealing devices, scales, funnels, sifters, grinders, glass panes, mirrors, razor blades, and substances used to "cut" or dilute illegal narcotics.

    c.  Books, records, receipts, notes, ledgers, and other papers relating to the purchase, storage, or distribution of controlled substances.  Such documents include, but are not limited to, prescriptions; ledgers; text or email messages from or to suppliers,

customers or associates pertaining to the transportation, ordering, sale, and distribution of controlled substances or the disposition of proceeds; bank records; money orders; wire transfers; cashier's checks; checkbooks; passbooks; certificates of deposit; vehicle rental receipts; credit card receipts; and receipts reflecting rental properties and/or storage units.

d.  Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the identity and contact information for co-conspirators, drug suppliers, and drug customers.  Such documents include, but are not limited to, telephone address books; planners; notes; ledgers; and telephone bills.

e.  Cash, currency, and currency counting machines, and records relating to controlled substances income and financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in controlled substances.  Such items include, but are not limited to, jewelry; precious metals such as gold and silver; precious gems such as diamonds; titles; deeds; monetary notes; registrations; purchase or sales invoices; and bank records.

f.  Documents or tangible evidence reflecting dominion, ownership, and/or control over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage facilities.

g.  Airbills, labels for overnight deliveries and Express Mail deliveries, receipts and other documents pertaining to such shipments.

h.  Items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises.  Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, bank statements, credit card receipts, identification documents, and keys.

i.  Photographs, videos, or other records concerning controlled substances, proceeds from the sales of controlled substances, or identities of coconspirators.

j.  Cellular telephones, and evidence that tends to identify the person having dominion and control over the cellular telephone, such as electronic address books or contact lists on the phone, call logs, saved text messages, saved usernames and passwords and documents.

30.     Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am aware that it is generally a common practice for drug traffickers to maintain in their residences records relating to their drug trafficking activities.  Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances.  Often drug traffickers keep ledgers or "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the trafficker's suppliers and the trafficker's dealers.  Additionally, drug traffickers must maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business.  I am also aware that drug traffickers often maintain such documents related to their drug trafficking activities at their residences for an extended period of time, regardless of whether they are physically in possession of drugs on the premises.

31.     Even when drug dealers store their drugs outside their residences, I know that they often will keep records relating to these offsite storage locations at their primary residence.  Such documents include rental or storage property agreements and receipts.

32.     Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am aware that it is generally a common practice for traffickers to conceal, at their residences or locations of operations, large sums of money, either proceeds from drug sales or monies to be used to purchase controlled substances.

33.     Furthermore, drug traffickers typically make use of wire transfers, cashier's checks, and money orders to pay for controlled substances.  Drug traffickers also often maintain one or

more currency counting machines to aid in counting their drug proceeds.  Many experienced drug traffickers will often engage in money laundering to conceal the source of their drug proceeds and will use proceeds to purchase legitimate investments or expensive jewelry and precious metals.  In other instances, drug traffickers will combine cash from their drug trafficking with cash deposits from other legitimate business activities in an attempt to hide their illegal conduct.  Evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking would also typically be maintained in residences.

34.     Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am also aware that drug traffickers generally try to hide cash and sensitive documents related to their drug trafficking and money laundering activities in safes or other containers so that other individuals who are at their residence do not discover these materials.

35.     Many drug dealers receive their drugs through overnight parcels and keep mailing labels and airbills both used and unused in their residence for future use.  Additionally, such drug traffickers often send the proceeds of their drug sales via overnight delivery, Western Union, and/or wire to their suppliers in order to pay for a continuing supply of drugs.  Such individuals will often maintain records of these transactions for a period of time in case there is a later dispute concerning what funds were transmitted and when.

36.     During the course of residential searches, I and other agents have also found items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises.  It is common for drug traffickers to reside in locations that have utilities subscribed to in the names of friends, relatives, and/or significant others. This is done in an effort to thwart law enforcement detection. Evidence of occupancy, residency, rental and/or

ownership of the premises is relevant to the prosecution of the Target Offenses.  Such identification evidence is typical of the articles people commonly maintain in their residences, such as cancelled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys.  Furthermore, records of residency linking a person to a particular location are durable and are reasonably likely to be maintained for long periods of time for several reasons, such as record keeping.  Many documents and records are largely innocuous, or at least are perceived as such, while many documents and records have other utility.  For example, a person involved in the trade of illegal drug is unlikely to discard passports, licenses, titles to motor vehicles, bank books, address books, or bills.  These are necessary to prove ownership – even if they are in the name of a proxy – and they can be helpful when attempting to flee police.

37.    Based on training and experience, I know that most drug dealers regularly use cellular telephones to communicate about their drug trafficking activities with customers, suppliers, and other coconspirators.  In my training and experience, I also am aware that drug traffickers are often aware of law enforcement's use of electronic surveillance, and thus frequently change cellular telephone numbers and/or use multiple cellular phones at the same time, as well as prepaid cellular phones (where the subscriber of the phone is not required to provide personal identifying information), in an effort to thwart law enforcement's use of electronic surveillance. Because cellular telephones are often a principal means of communication, drug dealers typically keep the phones in close proximity or at their residences.  Additionally, in my experience, many drug dealers do not dispose of their cellular telephones when getting a new number, but instead just discard them in various locations in their residences.  As a result, it is common to recover not only paper records pertaining to the use of a cellular phone by drug dealers, such as bills, call detail

records, statements, and other documents, but the cellular telephones themselves, from drug dealers' residences.

38.     Based upon my knowledge, training and experience, I know that a cellular telephone is a handheld wireless device used primarily for voice communication through radio signals.  These telephones send signals through networks of transmitter/receivers called "cells," enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones now offer a broad range of capabilities.  These capabilities include, but are not limited to: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and email; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.  Based on my training and experience, I know that many cellular telephones have the capabilities described above.

39.     Seizure of devices containing this information will provide information relating to coconspirators and accomplices.  I know, based upon my training and experience, as well as consultation with other investigators, that individuals who sell illegal drugs typically use cellular telephones to communicate with their suppliers, their customers, and with other coconspirators, and that they communicate both via both voice calls and via email and/or text messaging.  I also know that persons who sell illegal drugs regularly keep records of their illegal activities.  These records can include, but are not limited to, contact list of buyers and sellers, ledgers of sales and

money owed by customers or to suppliers, and lists of quantities and/or specific controlled substances preferred by or ordered by specific customers.  Individuals engaged in drug trafficking activities often take photographs of their closest confederates.  Records of drug trafficking activities can be produced and maintained on paper in a tangible form and/or by electronic means on a cellular telephone.  From my training and experience, and information provided to me by other agents, I am aware that individuals commonly store records of the type described in Attachment C on their cellular telephones.

40.     Additionally, I know that many drug traffickers often use cellular telephones in order to communicate quickly and economically with their suppliers and customers via the internet.  I am also aware that individuals frequently use cellular telephones to create and store records of their actions by communicating with others through e-mail, electronic messages, and updates to online social-networking websites; keeping their calendars; arranging for travel; storing pictures; researching topics related to drug trafficking; and accessing their bank, financial, investment, utility, and other accounts online.  Additionally, many cellular phones today have a GPS navigation device on the phone.  Examination of the GPS data on a cellular phone can provide valuable evidence as to the locations where drug traffickers meet with coconspirators, including their sources of supply, and can aid in identifying those individuals.  Additionally, review of GPS data can aid in identifying offsite locations where drug traffickers store drugs, maintain bank accounts, and conceal their drug proceeds.

41.     Based upon my training and experience, and information provided to me by others involved in the forensic examination of computers, I know that electronic data on cellular telephones can be stored in a variety of methods, including, but not limited to, within the memory of the cellular telephone; within volatile memory, such as RAM; or on removable media, such as

memory cards.  I also know that electronic data can often be recovered months or even years after it has been written, downloaded, saved, deleted, or viewed locally or over the internet.  This is true because:

a.  Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost.  Furthermore, when users replace their electronic equipment, they can easily transfer the data from their old device to a new one.

b.  Even after files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a device, the data contained in the file often does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time.  In addition, the device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.  Wholly apart from user-generated files, electronic storage media often contains electronic evidence of how the device has been used, what it has been used for, and who has used it.  This evidence can take the form of operating system configurations, artifacts from operating system or application operation; file system data structures, and virtual memory "swap" or paging files.  It is technically possible to delete this information, but users typically do not erase or delete this evidence because special software is typically required for that task.

d.  Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."  The browser on a cellular telephone often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

42.  Also from my training and experience, I know that drug dealers often possess firearms and other dangerous weapons to protect their profits, supply of drugs, and persons from others who might attempt to forcibly take the dealers' profits and/or supply of drugs.

43.     Based on the foregoing, I believe there is probable cause to believe that evidence of the commission of the Target Offenses, more specifically, the items set forth in Attachment C will be found at the Target Locations described in Attachments A and B.

## CONCLUSION

44.     Based upon the evidence set forth above, as well as my knowledge, training and experience, I submit that there is probable cause to believe that at the Target Locations, as described in Attachments A and B there exist evidence, fruits, and instrumentalities of drug distribution activities as set forth in Attachment C.  Accordingly, I respectfully request that search warrants be issued for the search of the Target Locations described in Attachments A and B, for the items detailed in Attachment C.

45.     Further, based upon the evidence set forth above, as well as my training and experience, I submit that there is probable cause to believe that beginning no later than September 5, 2019 continuing until at least on or about October 10, 2019, Steven PEREZ and Anthony HOLLOWAY conspired to distribute and possess with intent to distribute fentanyl, in violation of 21 U.S.C. §§ 846 and 841(a)(1). Accordingly, I respectfully request that a criminal complaint charging Steven PEREZ and Anthony HOLLOWAY with violations of 21 U.S.C. §§ 846 and 841(a)(1) be issued.

46.     Disclosure of the contents of the applications, affidavit, search warrants, and complaint could compromise and jeopardize this ongoing investigation by allowing PEREZ and/or HOLLOWAY to flee and/or destroy evidence.  For that reason, I request that the applications, affidavit, search warrants, and complaint be sealed until further order of the Court.



_____
TYLER SACKETT
Special Agent
Federal Bureau of Investigation

SIGNED and SWORN to before me this day, December 9, 2019.

_____
HONORABLE M. PAGE KELLEY
United States Magistrate Judge
District of Massachusetts

22

## ATTACHMENT A

## 36 OAKLAND AVENUE, APARTMENT 16, METHUEN, MASSACHUSETTS

The premises at 36 Oakland Avenue, Methuen, Massachusetts is a multi-unit apartment building. It has a brick exterior with a red front door and a white rear door. The front door has the numbers 13, 14, 15, and 16 listed above it.  The location to be searched is Apartment 16 on the second floor and is accessible through the front door or rear door of the building. A photograph of the building is attached.





**ATTACHMENT B**

**367 HILDRETH STREET, APARTMENT 22, LOWELL, MASSACHUSETTS**

The premises at 367 Hildreth Street, Lowell, Massachusetts is a multi-unit apartment building. It has a brick exterior with a glass front door, glass rear door, and red side door. The number is 367 affixed to the building outside both the front and rear doors with a sign that says Building F, 367, units 11-36. The location to be searched is Apartment 22 of the building. A photograph of the building is attached.







## ATTACHMENT C

### (Items to be seized)

All records, from January 1, 2019 to present, in whatever form, and tangible objects that constitute evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (distribution and possession with intent to distribute controlled substances); 21 U.S.C. § 843(b) (use of a communication facility during or in relation to a controlled substances trafficking offense); and 21 U.S.C. § 846 (conspiracy to distribute and possess with intent to distribute controlled substances) (collectively, the "Target Offenses"):

1. Books, records, receipts, notes, ledgers, and other papers relating to the purchase, storage, or distribution of controlled substances. Such documents include, but are not limited to, prescriptions; ledgers; text or email messages from or to suppliers, customers or associates pertaining to the transportation, ordering, sale, and distribution of controlled substances or the disposition of proceeds; bank records; money orders; wire transfers; cashier's checks; checkbooks; passbooks; certificates of deposit; vehicle rental receipts; credit card receipts; and receipts reflecting rental properties and/or storage units.

2. Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the identity and contact information for co-conspirators, drug suppliers, and drug customers. Such documents include, but are not limited to, telephone address books; planners; notes; ledgers; and telephone bills.

3. Cash, currency, and currency counting machines, and records relating to controlled substances income and financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in controlled substances. Such items include, but are not limited to, jewelry; precious metals such as gold and silver; precious gems such as diamonds; titles; deeds; monetary notes; registrations; purchase or sales invoices; and bank records.

4. Documents or tangible evidence reflecting dominion, ownership, and/or control over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage facilities.

5. Airbills, labels for overnight deliveries and Express Mail deliveries, receipts and other documents pertaining to such shipments.

6. Items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises. Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal

27

telephone books, diaries, utility and telephone bills, bank statements, credit card receipts, identification documents, and keys.

7.      Photographs, videos, or other records concerning controlled substances, proceeds from the sales of controlled substances, or identities of coconspirators.

8.      Cellular telephones used by or belonging to Steven Perez or Anthony Holloway, and all names, words, telephone numbers, email addresses, time/date information, messages or other electronic data relating to or referencing drug trafficking and/or referencing individuals engaged in drug trafficking located in the memory of any mobile telephone, including but not limited to:

     a.      Names and contact information that have been programmed into the device(s) (including but not limited to contacts lists) of individuals who may be engaged in drug trafficking;

     b.      Logs of calls (including last numbers dialed, last calls received, time of calls, missed calls, and duration of calls) both to and from the device(s);

     c.      Text messages both sent to and received by the device(s) (including any in draft form) relating to or referencing drug trafficking and/or referencing individuals engaged in drug trafficking;

     d.      Incoming and outgoing voice mail messages both to and from the device(s) relating to or referencing drug trafficking or individuals engaged in drug trafficking;

     e.      GPS data;

     f.      Browser messages and/or internet communications (e.g., e-mail, text messages) both to and from the device(s) (including any in draft form) relating to or referencing drug trafficking or individuals engaged in drug trafficking;

     g.      Documents, photographs, or videos in any format, including but not limited to Microsoft Word or Adobe PDF files, relating to or referencing drug trafficking or individuals engaged in drug trafficking;

h.     All data within the device(s) evidencing ownership, possession, custody, control, or use of the device(s); and

i.     Service Provider handset unlock password(s) and any other passwords used to access the electronic data described above.